# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| A. B. through his Parent K.B., <br> Plaintiff, | CIVIL ACTION |
| v. | |
| ABINGTON SCHOOL DISTRICT, <br> Defendants. | NO. 19-1914 |

## MEMORANDUM OPINION

The parties have filed cross-motions for judgment on the administrative record following an Administrative Due Process Hearing and a decision by a Pennsylvania Special Education Hearing Officer denying Plaintiff's claim for tuition reimbursement from Defendant Abington School District (the District). For the reasons that follow, the Hearing Officer's decision is affirmed.

I. **Background**

A.B. is an autistic twelve-year-old resident of the District. From first through fourth grades (Fall 2012 to Spring 2016), A.B. attended Highland Elementary School, one of the District's elementary schools. In 2012, when A.B. was in first grade, the District evaluated him and identified him as a student requiring special education services. The District subsequently developed and implemented Individualized Education Plans (IEPs) for A.B., most recently at the beginning of A.B's fourth grade year, in the Fall of 2015. After A.B. completed fourth grade, however, A.B.'s mother withdrew him from Highland and enrolled him in Abington Friends School, a private Quaker school located within the District. Following A.B.'s withdrawal from Highland, the District mailed A.B.'s mother, K.B., a notice informing her that programming would be made available to A.B. if she chose to re-enroll him in a District school. K.B. has indicated that she received this notice and understood its content.

The next contact K.B. had with the District was in October 2017 (*i.e.*, the Fall of A.B.'s sixth grade year), when she wrote an email to Highland's Principal, Dr. Jim Etlen. The email was two sentences long and read: "Per our conversation in May 2016, I did not feel Highland was meeting A.B.'s needs. I am interested in finding out what programs the district can offer A.B., please let me know." Etlen, who had not heard from K.B. since A.B.'s fourth grade year, responded that same day by inquiring, "I'm not sure if this is a recent email or something that is just making its way to my inbox. Could you clarify this for me?" K.B. responded, "I am currently looking for information about programming in the district for A.B. and the next steps I would take."

Etlen and K.B. then spoke on the phone in December 2017. That same day, Etlen emailed K.B., stating "Per our conversation, since A.B. will be entering 7th grade in the fall I believe Dr. Matt Wexler, coordinator of student services at the junior high school would be best to answer your questions regarding programming for next year." (Emphasis added). K.B. did not contradict Etlen's understanding of their conversation. Etlen also emailed Wexler that day, explaining that he had just spoken to K.B. and that "[s]he was interested in programming for her son, however, if they decide to return he will be entering 7th grade in September." About five weeks later, in January 2018, K.B. sent Wexler a two-sentence email reading, "I am interested in finding out what programs the school district can offer. Please let me know."

The District and K.B. disagree about what happened next, though K.B. does admit that she never asked for an evaluation "[b]ecause A.B. already had an IEP." K.B. contends that neither Wexler not anyone else from the district followed up with her in response to her January 2018 email, while the District contends that Wexler did follow up but that K.B. did not express further interest in the District's programming. The District bases its position on Wexler's

recollection that he spoke to someone he believed to be A.B.'s mother sometime after receiving the January 2018 email. Wexler said that, during this conversation, he described the type of special education services the District offers and answered a few questions, that he specifically noted that the person on the phone seemed disappointed when he explained that the District does not "offer one-to-one laptops or technology" and that the person then ended the call with something to the effect of "thank you for the information." He also noted that the person did not ask about an evaluation for her child.

Both parties agree that K.B. emailed Wexler in August 2018 of that year. Her email read:

> As you know, my son [A..B.] is a special education student of the Abington School District who has been attending private school. I do not believe that the School District has offered an appropriate program and placement for [A.B.] for the upcoming school year, leaving us with no other option but to continue [A.B.]'s enrollment at Abington Friends for the 2018-2019 school year, and we ask that the school district fund the tuition. If there is anything the School District needs at this time, please do not hesitate to contact me.

The District denied the request for payment,[1] and A.B.'s mother requested a Due Process Hearing on the matter—the outcome of which forms the basis of this case. In her Due Process Complaint, K.B. asserted that:

> [The District's] failure to offer a special education program to Student for the 2017-18 and 2018-19 school year operated to deny student a free, appropriate public education (FAPE) under the [Individuals with Disability Education Act (IDEA)] and Section 504 of the Rehabilitation Act of 1973, as well as the federal and state regulations implementing those statutes.

And, she requested reimbursement from the District for A.B.'s private school tuition for those years. The Hearing Officer defined the issues before her as:

(1) Whether the District had an obligation to develop and offer A.B. a special education program for the 2017-18 school year;

---

[1] The District also requested permission to evaluate A.B. A.B.'s mother approved the evaluation but challenged the results. That challenge is still pending and is not related to this action.

3

(2) Whether the District had an obligation to develop and offer A.B. a special education program for the 2018-19 school year;

(3) If the District was required to develop and offer A.B. a special education program for either or both of the 2017-18 and 2018-19 school years, is the private school appropriate for the student; and

(4) If the District was required to develop and offer A.B. a special education program for either or both of the 2017-18 and 2018-19 school years, and the private school appropriate for the student, are there equitable considerations to reduce or deny the request for tuition reimbursement?

She concluded that the District did not have an obligation to develop and offer A.B. a special education program for his sixth and seventh grade years because "the vague questions that the Parent asked of the two District representative over a several month period were not sufficient to alert the district to any responsibility to do more than it did during the 2017-2018 school year" and because with "no objective manifestation of a desire for a proposed program or even communication to the District about Student between January and August 2018, there is no basis for finding any obligation on the part of the District for the 2018-2019 school year." Because the Hearing Officer found that the District had not denied A.B. a FAPE, she rejected K.B.'s claim for tuition reimbursement and did not address whether Abington Friends was an appropriate educational placement for A.B. or whether equitable considerations demanded a reduction in the reimbursement.

Acting on behalf of A.B., K.B. initiated this action against the District, asserting violations of the IDEA and Section 504 of the Rehabilitation Act, as well as of the Americans with Disabilities Act (ADA).[2] She asks the Court to reverse the Hearing Officer's decision and

---

[2] Plaintiffs' ADA claim will be dismissed pursuant to 20 U.S.C. § 1415(l) for failure to exhaust administrative remedies, as Plaintiffs did not raise an ADA claim at the Administrative Due Process Hearing. *See* I.H., 842 F. Supp.2d at 776 (*citing R.R. v. Manheim Twp. Sch. Dist.*, 412 Fed. App'x. 544, 550 (3d Cir.2011)) ("[W]here the ADA claim is based on the same set of circumstances and seeks the same relief as the IDEA claim but was not raised at the administrative level, it fails the exhaustion doctrine.").

order the District to pay tuition reimbursement and related costs for A.B.'s sixth and seventh grade years at Abington Friends, as well as reasonable attorneys' fees and costs.

## II. Discussion[3]

### i. *Standard of review for administrative proceedings*

A district court applies a "modified de novo" standard in reviewing the decision of a Hearing Officer. *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003). Under this "unusual" standard, "although the [d]istrict [c]ourt "must make its own findings by a preponderance of the evidence," it "must also afford 'due weight' to the [Hearing Officer's] determination." *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). Specifically,

> factual findings from the administrative proceedings are to be considered prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why. In addition, if a state administrative agency has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory testimony of another witness, that determination is due special weight. [T]his means that a [d]istrict [c]ourt must accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would *justify* a contrary conclusion.

*Id.* (internal quotations, citations and alterations removed).

### ii. *IDEA and Section 504 claims*

#### a. IDEA and Section 504 generally

"Under the IDEA, a state receiving federal educational funding must provide children within that state a 'free appropriate public education' (FAPE)." *C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 65 (3d Cir. 2010). "A school district provides a FAPE by designing and implementing an individualized instructional program set forth in an Individualized Education

---

[3] Jurisdiction is proper here pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i), which provides that a party aggrieved by a Hearing Officer's findings and decision may bring an action in federal district court.

Plan (IEP), which must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 729-30 (3d Cir. 2009) (internal quotations omitted). "[A]n IEP . . . is, in essence, an offer of a FAPE." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 771 (M.D. Pa. 2012).

"The IDEA also requires that a state have a system in place to identify, locate, and evaluate all children in the state who have disabilities and need special education and related services," *i.e.*, the "Child Find" requirement.[4] *P.P.*, 585 F.3d at 730. If a district suspects a child of having a disability, the district "must conduct an evaluation of the [child's] needs, assessing all areas of suspected disability, before providing special education and related services to the child." *Id.*

As for Section 504, it and the IDEA "do similar statutory work." *P.P.*, 585 F.3d at 735. Under Section 504, recipients of federal funds must "provide a [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a). Section 504 "is parallel to the IDEA in its protection of disabled students: it protects the rights of disabled children by prohibiting discrimination against students on the basis of disability, and it has child find, evaluation, and FAPE requirements." *Id.*[5]

---

[4] Pennsylvania codifies these Child Find duties at 22 Pa.Code. §§ 14.121-14.125. Under Pennsylvania law, school districts must: 1) implement a "public outreach awareness system" to notify the public of its special education services; 2) establish a screening system to identify children requiring such services; 3) evaluate children suspected of requiring such services following receipt of permission from parents, or upon parents' request; and 4) re-evaluate students where appropriate. *See* 22 Pa.Code. §§ 14.121-14.124. In short, Child Find places the burden on districts, rather than on parents, to identify a child as a student in need of services. *See Culley v. Cumberland Valley Sch. Dist.*, 758 F. App'x 301, 306 (3d Cir. 2018).

[5] Because "[t]he claims in this case made under § 504 are parallel to the IDEA claims," *i.e.*, because both claims concern the District's alleged FAPE denial, resolution of the IDEA issue will also resolve the Rehabilitation Act issue. *See P.P.*, 585 F.3d at 730. The Court's analysis will thus focus on the IDEA, and resolution of the IDEA

6

### b. Districts' IDEA obligations to students in private schools

Though generally "[a] school district is obligated to have an IEP in place at the beginning of the school year," *D.P.*, 482 F. App'x at 672 (citing 20 U.S.C. § 1414(d)(2)(A)), "[i]f a student is enrolled at a private school because of a parent's unilateral decision [to wit, when a student is disenrolled from a public school and placed in a private school without the district's consent] the school district does not maintain an obligation to provide an IEP." *Sch. Comm. of Town of Burlington, Mass.*, 471 U.S. at 365 (citing 20 U.S.C. § 1412[a][10][A][i]); *see also I.H.*, 843 F. Supp.2d at 772 ("[T]he IDEA does not require the school district of residence to provide a FAPE to an unenrolled student residing in its district."). That is because "[u]nder the federal regulations, a school district has different obligations to students enrolled in private schools by their parents as opposed to students enrolled by the school district." *D.P.*, 482 F. App'x at 672; *see* 34 C.F.R. § 300.137 ("No parentally-placed private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school."). "The statutory framework logically suggests that [a school district] need not have in place an IEP for a child who has unilaterally enrolled in private school and thereby rejected the district's offer of a FAPE." *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp.2d 1057, 1068 (D.N.J. 2011).

Nevertheless, a school district maintains its obligation to provide *an offer of a FAPE* to such a child—*i.e.*, to evaluate such a child and develop an IEP for him—upon parental request, [6] and a district which does not comply with such a request fails in its FAPE obligations, and, thus,

---

issue in this case will also resolve the Section 504 issue.

[6] This is in contrast to the Child Find requirements, which place the initial burden of "identify[ing] children in need of special education services" on school districts and are not triggered by parental requests. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012).

violates the IDEA. *Id.* at 1069 (explaining that "the statutory language makes clear that where parents request reevaluations of their child for purposes of having an offer of a FAPE made for him, and the child is domiciled in the district, the school district must comply"). Parents who have unilaterally enrolled their child in private school are "entitled to request a reevaluation of the student's IEP at any time [from their resident school district], 20 U.S.C. § 1414(a)(2)(A)(ii),[7] [which evaluation a] district must complete within 60 calendar days, 22 Pa. Code § 14.124(b)," *D.P.*, 482 F. App'x at 673, regardless of whether the child is enrolled in a district school or not, *see Moorestown*, 811 F. Supp.2d at 1077.[8]

Because the IDEA imposes no obligation on school districts to *sua sponte* evaluate and develop IEPs for students unilaterally placed in private schools, "the first question" a court must answer in determining whether a district violated its FAPE obligations by failing to propose a special education program for such a student is whether the parent made a "request" pursuant to the IDEA. *See id.* at 1067. The decision in this case turns on what a parent must do to be deemed to have made a "request" for a reevaluation in the context of Section 1414(a)(2)(A)(ii) of the IDEA.

Cases interpreting "request" under the IDEA have generally construed the term narrowly. In *D.K.*, for example, the Third Circuit explained that "general expressions of concern [do not] constitute a 'parental request for evaluation.'" 696 F.3d at 248 n.5 (interpreting phrase "parental request for evaluation" in 20 U.S.C. § 1514(d)(1)(A)(1)). Likewise, *H.D. by & Through Jeffrey*

---

[7] 20 U.S.C. § 1414(a)(2)(A)(ii) provides that "[a] local educational agency shall ensure that a reevaluation of each child with a disability is conducted . . . if the child's parents or teacher requests a reevaluation."

[8] If this were not the case "[p]arents would have to enroll their child in public school with no information about the type of program the district may offer, where the child may be placed, or even if the district's IEP would constitute a FAPE," *Moorestown*, 811 F. Supp.2d at 1070—a result inconsistent not only with the language of 20 U.S.C. § 1414(a)(2)(A)(ii), but also with the IDEA's "broad purpose of providing children with disabilities a FAPE," *see Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238 (2009); *see also I.H.*, 842 F. Supp.2d at 773.

*D. v. Kennett Consolidated School District*, held that a school district did not deny a child a FAPE by failing to perform "further evaluation in anticipation of possible reenrollment" where the parent's request was not "clearly" made. 2019 WL 4935193, at *24 n.11 (E.D. Pa. Oct. 4, 2019). And, consistent with the Third Circuit, the Eleventh Circuit in *Durbrow v. Cobb County School District* found that a parent's request for "help" or to "test [the child] for something" would not have "amount[ed] to a parental request for an IDEA evaluation." 887 F.3d 1182, 1193 (11th Cir. 2018). By contrast, in *Moorestown*, parents were found to have made a "request" for IDEA purposes where they objectively manifested their desire for an evaluation and IEP in letters to the district requesting that "the child study team conduct appropriate evaluations," explaining that they needed to discuss the school district's proposed program before deciding whether to continue their child's private placement, and noting that the statutory deadline for evaluating their child and developing an IEP was approaching. 811 F. Supp. 2d at 1067; *see also James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764, 768 (6th Cir. 2000) (finding that school district violated its IDEA obligations when it refused to develop an IEP for a student unilaterally placed in private school despite "the parents *specifically* approach[ing] the school district about re-enrollment and obtaining a new IEP" (emphasis added)).

     v.    District's obligations to Plaintiffs

At the Due Process Hearing, the Hearing Officer heard testimony from witnesses for both parties, including K.B., Etlen and Wexler. She detailed her findings of fact in a February 2019 order which denied Plaintiff's request for tuition reimbursement. Of critical relevance is the Hearing Officer's findings that K.B. did not intend to remove A.B. from Abington Friends and re-enroll him in the District in the middle of his sixth grade year; that Etlen understood K.B.'s December 2017 call as relating to seventh grade programming, (*i.e.,* to the 2018-19 school year);

9

that "all of the witnesses who testified [were] generally credible;" but that Wexler's testimony on the issue of whether he followed up with K.B. after her January 2018 email "is deemed to be more reliable than that of the Parent on this specific fact" because "Parent's testimony, while clearly heartfelt and at time emotional, was not persuasive that [Wexler] failed to contact or otherwise respond to her at all."

Plaintiffs argue that the Hearing Officer erred in holding that K.B.'s contacts with the District were insufficient to trigger its obligation to evaluate A.B. and propose an IEP for him. They assert the Hearing Officer applied the wrong legal standard when she inquired into whether K.B.'s contacts with the District objectively manifested a desire for the District to develop programming for A.B.. They insist that "there is no need [a parent] to 'objectively manifest a desire for' an evaluation or IEP or proposed program;" that "[a]ny such parental requests need not be clear or unambiguous;" and that "[a]ll parents need to do is put the District on notice that they are seeking possible programming." And, they contend that, to the extent K.B. was responsible for putting the District on notice, K.B.'s emails to Etlen and Wexler provided such notice. Plaintiffs also contest the Hearing Officer's finding that K.B. and Wexler discussed the District's special education services following K.B.'s January 2018 email.

While K.B. did not need to decide to give up A.B.'s spot at Abington Friends and send him to a District school *before* she knew what programming it would offer, she did need to request an evaluation by "objectively manifest[ing] a desire" for one. *See D.K.*, 696 F.3d at 248 n.5; *H.D.*, 2019 WL 4935193, at *24 n.11; *Moorestown*, 811 F. Supp.2d at 1067; *Durbrow*, 887 F.3d at 1193. This conclusion is consistent with the IDEA's general approach of limiting school districts' responsibilities towards students unilaterally placed in private schools. *See, e.g.,* 34 C.F.R. § 300.137.

*Shane T. by & through Cathy K. v. Carbondale Area Sch. Dist.*, 2017 WL 4314555 (M.D. Pa. Sept. 28, 2017), cited extensively by the Plaintiffs, is distinguishable. In *Shane T.*, the school district failed to evaluate a student unilaterally placed in private school following his re-enrollment in public school. *Id.* at *5. Here, by contrast, it is undisputed that A.B. was never re-enrolled in a district school.

Plaintiffs put much stock in the following language from *Shane T.*: "it is not the parent's obligation to clearly request an IEP or FAPE; instead, it is the school's obligation to offer a FAPE unless the parent makes clear his or her intent to keep the student enrolled in the private school." *Id.* at *15. To the extent that this "request" standard was intended as general guidance (as opposed to guidance specific to the *post*-re-enrollment request context) it is unpersuasive in that it is derived from a 2006 Office of Special Education and Rehabilitative Services (OSERS) policy document unrelated to the issue of what constitutes a "request" for purposes of triggering a school district's obligation to evaluate and propose an IEP for a student unilaterally placed in private school. *Id.* In that document, OSERS addressed confusion about which school district would be responsible for offering a FAPE to a student unilaterally placed in private school where a child resided in one district but attended school in another. The policy document explains that

> [i]f a determination is made by the LEA [*i.e.*, the school district] where the private school is located that a child needs special education and related services, the LEA where the child resides is responsible for making FAPE available to the child. If the parent makes clear his or her intention to keep the child enrolled in the private elementary or secondary school located in another LEA, the LEA where the child resides need not make FAPE available to the child.

71 Fed. Reg. 46540-01, 46593. While this policy statement addresses the question of which district must offer a FAPE to a child residing in one district but attending school in another, it does not address how a request for an offer of FAPE must be made when a parent has unilaterally enrolled in a private school but is exploring re-enrolling their child in the public

11

school district in which the child resides. Here, it is uncontested that A.B. both resides in the Abington School District and attends private school in that same district.

From a review of the record and of the law, giving due weight to the Hearing Officer's decision, the Court finds by a preponderance of the evidence that the Hearing Officer's decision is correct. Plaintiffs insist that Wexler never spoke to K.B. about programming for A.B.'s seventh grade year. However, Wexler recalled that he had "a very brief conversation" the week of January 29, 2018 with a parent explaining that her child was a student at Abington Friends and that, during the course of that conversation he "label[ed]" the type of special education support offered by the District and answered a few follow-up questions. Wexler testified that the conversation ended with something to the effect of "thank you for the information," and it is uncontested that K.B. had no contact with the District after her January 2018 email until she made a request for tuition reimbursement seven months later. Though Wexler could not remember the name of the person he had spoken with, the details he did remember—such as the student at issues' private placement and the timing of the conversation with the parent—were consistent with Plaintiffs' situation. The Hearing Officer—who had the opportunity to see and hear the witness' live testimony in this case, including that of K.B. and Wexler—determined that Wexler's testimony to the contrary was more credible than K.B.'s. The Court affords the Hearing Officer's determination "special weight" and accepts her determination on this matter as true, because no "non-testimonial, extrinsic evidence in the record . . . justif[ies] a contrary conclusion." *Shore Reg'l High Sch. Bd. of Educ.*, 381 F.3d at 199.

K.B.'s contacts with the District were insufficient to trigger the District's responsibility to evaluate A.B. and propose an IEP. Unlike in *Moorestown*, at no point did K.B. mention an IEP. Neither did she request that the District evaluate A.B., develop a special education program for

him, or provide him with any type of services. At most, K.B.'s contacts with the District may be interpreted as requests for information about potential services. A request for information, however, is different from a request for action. *See, e.g.*, *A.B. v. San Francisco Unified Sch. Dist.*, 2008 WL 4773417, at *8 (N.D. Cal. Oct. 30, 2008) (identifying "requests for services" and "requests for information about programs, assessments, goals and objectives" separately in discussing whether school district had denied child a FAPE).

Because the District's obligation to propose a special education program for A.B. was never triggered—either for the 2017-18 or the 2018-19 school year—the District did not have an obligation to develop IEPs for A.B. for those years, did not deny A.B. a FAPE and Plaintiffs are, thus, not entitled to reimbursement from the District for the costs of private school education in those years. 20 U.S.C. § 1412(a)(1)(c)(i)-(iv); *Jalen Z. v. Sch. Dist. of Philadelphia*, 104 F. Supp. 3d 660, 678 n.10 (E.D. Pa. 2015) (citing *Sch. Comm. of Burlington, Mass.*, 471 U.S. at 369 (1985); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12, 15-16 (1993)) (no private school reimbursement if no denial of FAPE).

An appropriate order follows.

**February 24, 2020**　　　　　　　　　　　**BY THE COURT:**

　　　　　　　　　　　　　　　　　　　　　**/s/Wendy Beetlestone, J.**

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　**WENDY BEETLESTONE, J.**